**ANHEUSER–BUSCH, INC., Respondent,**

v.

**MISSOURI COMMISSION ON HUMAN RIGHTS, Appellant.**

No. 46832.

Missouri Court of Appeals,
Eastern District,
Division Two.

Sept. 18, 1984.

Motion for Rehearing and/or Transfer to Supreme Court Denied Dec. 5, 1984.

Application to Transfer Denied
Jan. 15, 1985.

Donald L. McCullin, St. Louis, for respondent.

John Ashcroft, Atty. Gen., Melinda A. Corbin, Asst. Atty. Gen., Jefferson City, for appellant.

SIMON, Judge.

Missouri Commission on Human Rights (MCHR), appeals from a judgment of the Circuit Court of the City of St. Louis affirming in part and reversing in part an order of MCHR. On appeal, MCHR contends the trial court erred in: (1) reversing, in part, MCHR's order and (2) assessing costs against MCHR, an agency of the state, since costs cannot be assessed absent statutory permission. Respondent, Anheuser-Busch, Inc. (Busch), contends that our court is collaterally estopped from reversing the trial court's order because the identical issue presented here was finally resolved on its merits in Busch's favor in another proceeding. We reverse in part and affirm in part.

Phyllistine Quinn, a black female, began working for Busch as a bottler on July 8, 1975. During her employment, Quinn was disciplined on numerous occasions, finally resulting in a four (4) week suspension.

Quinn filed a complaint with MCHR alleging disparate treatment by Busch in violation of § 296.020.1(1)(a), RSMo 1978, as amended, which states, in pertinent part, "[i]t shall be an unlawful employment practice [f]or an employer, because of the race ... of any individual [t]o ... discriminate against any individual with respect to his ... terms, conditions, or privileges of employment, because of such individual's race ... sex...." MCHR investigated the allegation and issued a Finding of Probable Cause but the parties failed to agree on a resolution and a public hearing was set before a hearing examiner appointed by MCHR.[1]

At the hearing, Quinn acknowledged that she was disciplined in accordance with Busch's policy, but stated that white employees with similar attendance records were reviewed less frequently and reprimanded less severely for similar violations. Her attendance record and the records of three white employees were offered to support the allegation. The following is a summary of several of plaintiff's exhibits:

| Name | Dates of Disciplinary Actions | No. of Absences or Tardies Since Last Disciplinary Action | Approx. No. of Months Since Last Disciplinary Action | Nature of Disciplinary Action |
|---|---|---|---|---|
| P. Quinn | 10/14/75 | 12 (since 7/8/75) | | Reprimand |
| Complainant | 8/10/77 | 51 | 22 months | Reprimand |
| (black female) | 10/6/77 | 9 | 2 months | 2 day suspension |
| | 4/21/78 | 18 | 6½ months | 1 week suspension |
| | 6/28/78 | 14 | 2 months | 2 week suspension |
| | 1/5/79 | 27 | 6 months | 4 week suspension |
| George Geno | 9/29/75 | 20 (since 1/1/75) | | Reprimand |
| (white male) | 5/11/77 | 53 | 20 months | 3 day suspension |
| | 10/14/77 | 25 | 5 months | 1 week suspension |
| | 12/13/78 | 26 | 14 months | Reprimand |
| Mary Bierman | 1/11/78 | 48 (since 7/10/75) | | Reprimand |
| (white female) | 9/3/79 | 43 | 13 months | 3 day suspension |

1. Procedurally, the attorney general was the plaintiff at the hearing, § 296.040.4 RSMo 1978, and neither Quinn nor MCHR was formally a party. Reference to plaintiff therefore are to the attorney general, who presented the case in support of the complaint. All references to Busch, Quinn, and MCHR have been changed to identify them by name rather than by their procedural status.

| Name | Dates of Disciplinary Actions | No. of Absences or Tardies Since Last Disciplinary Action | Approx. No. of Months Since Last Disciplinary Action | Nature of Disciplinary Action |
|---|---|---|---|---|
| Fred Reising (white male) | 9/24/74 | 28 (since 1/1/74) | | Reprimand. |
| | 2/18/75 | 23 | 5 months | 1 day suspension |
| | 6/28/78 | 114 | 40 months | Reprimand |
| | 1/15/79 | 28 | 6½ months | 3 day suspension |

David Curran, a plant supervisor, was called as a witness by Busch. His testimony consisted of a detailed explanation of Busch's policy and procedure for handling absenteeism, Quinn's disciplinary record and the disciplinary records of the three white employees.

The hearing examiner's findings of fact are, in pertinent part, as follows:

9. [Busch's] absentee control policy, Plaintiff's exhibit No. 1, provides a progressive discipline system to handle employees with an absentee problem. For purposes of the absentee control policy, an employee who is late for work or who leaves work early is treated as if he or she were absent. An absence which extends for a period of consecutive days is treated as one absence and not as one for each day missed.

The first step of the absentee control policy is applied if an employee is absent in excess of 15 times in a year. The next step of the progressive discipline system is applied if the employee is absent eight (8) or more times during the ensuing six months or between the last disciplinary action and the next review of his or her attendance record, whichever period is shorter.

The progressive discipline steps of the absentee control policy are as follows:

a. verbal warning;

b. reprimand;

c. one (1) to three (3) day suspension;

d. three (3) day to one (1) week suspension;

e. two (2) week suspension;

f. four (4) week suspension; and

g. termination.

If an employee corrects his or her absentee problem so that his or her absences number fifteen (15) or less for one year, then his or her record is wiped clean and any future absentee problem will activate the progressive discipline system at the reprimand stage.

10. [Busch's] absentee control policy provides for a review of each employee's attendance record every three (3) to four (4) weeks.

The evidence indicates that the reviews were less frequent and at irregular intervals.

11. Although [Quinn] denied being absent or tardy as many times as [Busch's] records indicated, there is no dispute that she had progressed to the four (4) week suspension stage of the progressive discipline system when she was suspended for four (4) weeks on January 9, 1979.

12. [Busch's] absentee control policy was applied to [Quinn].

13. The ultimate factual dispute to be resolved is whether [Busch's] absentee control policy was applied to [Quinn] in the same manner in which it was applied to Fred Reising, George Geno and Mary Biermann, white persons employed as bottlers for [Busch].

14. Although the evidence does not disclose the frequency with which [Quinn's] attendance records were reviewed, it is certain they were reviewed at or near the time of each disciplinary action taken against her. Thus, [Quinn's] attendance record was reviewed at or near the following dates:

a. October 14, 1975 — (reprimand)

b. August 7, 1977 — (reprimand)

c. October 6, 1977 — (2-day suspension)

d. April 21, 1978 — (1-week suspension)

e. June 28, 1978 — (2-week suspension)

f. January 8, 1979 — (4-week suspension)

15. The evidence also fails to disclose the frequency with which the attendance records of Reising, Geno and Biermann were reviewed.

16. It is clear, however, that the attendance records of the above-mentioned white employees were reviewed less frequently than [Quinn's] or, in the alternative, that [Busch's] absentee control policy was not applied to them when reviews of their records disclosed violations of the policy.

17. If the attendance records of the three white employees had been reviewed as frequently as [Quinn's] were and if [Busch] had applied its absentee control policy to them, each of the three white employees would have progressed to a more severe disciplinary step of the progressive discipline system than they did.

18. David Curran, [Busch's] supervisor of plant employee relations, was [Busch's] only witness. He articulated reasons for the less frequent reviews of George Geno's and Mary Biermann's attendance records. The reasons he gave were that Geno was away from work for an extended period of time because of personal family problems and illness and that Biermann was laid off for an extended period of time. He indicated that the extended absence of Geno and Biermann obviated the necessity of reviewing their attendance records at normal frequency.

Curran was unable to articulate a reason for Fred Reising's attendance record being reviewed less frequently than [Quinn's].

19. A review of the attendance records of Geno and Biermann substantiates [Busch's] contention that they were absent from work for extended periods of time.

Based on his findings, the examiner made conclusions of law, in pertinent part as follows:

2. [Busch] is an employer within the meaning of Section 296.010(2), RSMo 1978.

3. In order to establish a prima facie case of race discrimination in violation of Section 296.020(1)(a), RSMo 1978, with regard to the suspension, Plaintiff must establish:

a. [Quinn] is protected by the statute;

b. [Quinn] was suspended; and

c. Some evidence from which to infer that [Quinn's] race was a factor in [Busch's] decision to suspend her.

Plaintiff has established a prima facie case of race discrimination with regard to the suspension. There was no dispute that [Quinn] a black female, is protected by Chapter 296, RSMo 1978, or that she was suspended. Plaintiff completed its prima facie case by adducing evidence that similarly situated white employees' attendance records were reviewed less frequently than [Quinn's] and that as a consequence, [Quinn] received more severe discipline than did the white employees with similar attendance problems.

5. If the Plaintiff establishes a prima facie case, the burden shifts to [Busch] to articulate a legitimate, non-discriminatory reason for the disparate treatment. *McDonnell Douglas v. Green,* 411 U.S. 792, 803 [93 S.Ct. 1817, 1824, 36 L.Ed.2d 668] 5 FEP Cases 965 (1973). The reasoning of the *McDonnell Douglas* case was cited with approval in dictum in *General Motors v. Fair Employment, Etc.,* 574 S.W.2d 394, 397–398 (Mo. banc 1978), and in *County of St. Louis v. Brooks, et al.,* 614 S.W.2d 283 (Mo.App., E.D.1981).

6. [Busch] articulated legitimate, nondiscriminatory reasons for the less frequent reviews of the attendance records of George Geno and Mary Biermann. It did not, however, articulate a legitimate, nondiscriminatory reason for the less frequent review of the attendance record of Fred Reising.

7. Plaintiff has established that [Quinn's] attendance record was reviewed more frequently than a similarly situated white employee, the result of which was that [Quinn] was disciplined more severely than was Fred Reising for a similar number of absences.

Without the articulation of a legitimate, nondiscriminatory reason for the

disparate treatment, the inference that [Quinn's] race was a factor remains unrebutted.

8. Plaintiff has established by a preponderance of the evidence that [Quinn's] race was a factor in [Busch's] decision to suspend her for four weeks.

Based on his findings and conclusions of law, the examiner recommended the following Decision and Order:

1. That [Busch] shall cease and desist from using race as a factor in its decision to discipline some employees more severely than others.

2. That [Busch] shall expunge from [Quinn's] personnel records any reference to the discriminatory suspension of January 8, 1979.

3. That [Busch] shall institute procedures to ensure that the attendance records of all its plant employees are reviewed on a regular and uniform basis; and shall file a report outlining such procedures with the Missouri Commission on Human Rights' compliance section within thirty (30) days of the date this decision and order becomes final.

4. That Plaintiff has failed to establish that [Quinn] is entitled to any back pay as a result of [Busch's] discrimination.

MCHR adopted the hearing examiner's findings, decision and and order concluding that the decision to suspend Quinn was based upon her race.

The Circuit Court of the City of St. Louis, reviewing MCHR's decision and order, pursuant to § 296.050 RSMo 1978, affirmed orders (3) and (4), but reversed orders (1) and (2) finding:

There was no substantial and competent evidence to support the Commission's finding that [Busch's] absentee control policy was applied to [Quinn] in a discriminatory manner. The only evidence before the Commission on the entire issue of whether said policy was applied discriminatorily was a comparison of the application of the policy to [Quinn], a black, and three white employees. The Commission found that the evidence did not disclose the frequency with which [Quinn's] attendance records were reviewed, nor the frequency with which the attendance records of the three white employees were reviewed. Commission's Findings of Fact 14 and 15. Despite this, however, the Commission then made an inconsistent finding that the records of the white employees were reviewed less frequently than [Quinn's]. Commission's Finding of Fact 16. This indicates the Commission's decision was not based on competent and substantial evidence on the record. The Commission's further finding in Finding 16, "that [Busch's] absentee control policy was not applied to them (white employees) when reviews of their records disclosed violations of the policy "is also unsupported by the record. The Commission merely assumed that because [Quinn] was disciplined more often, her record must have been reviewed more frequently.

The white employees were disciplined under the employer's absentee control policy. Furthermore, the Commission found, in Finding 18, that there were reasons why two of the three white employees' attendance records might be reviewed less frequently than [Quinn's]. See also the Commission's Conclusion of Law No. 6, which concludes that [Busch] articulated legitimate, nondiscriminatory reasons for the less frequent review of the attendance records of two of the three white employees.

Thusly, it could only be upon the comparison between the frequency of review of [Quinn's] records with that of one white employee's (Reising's) that the Commission could possibly have based its erroneous orders. There was no competent and substantial evidence upon the record to support discrimination against [Quinn] by comparing the frequency of review of her absenteeism with that of this one white employee's. Even if the evidence had shown a difference in frequency of review and discipline, it would not be very impressive, because it would

not be a statistically significant number of comparison to conclude bias.

On appeal, MCHR argues that the circuit court erred in reversing orders 1 and 2. We agree and therefore reverse the judgment of the circuit court with respect to those orders.

■ At the outset we stress the narrow scope of review of administrative decisions. The Commission's decision is to be affirmed unless its findings are not supported by competent and substantial evidence on the record; its decision is arbitrary, capricious or unreasonable, or unauthorized by law. *St. Louis County Board of Election Commissioners v. Missouri Commission on Human Rights,* 668 S.W.2d 592, 594 (Mo.App.1984). "Although this court may have decided the case differently as an original proposition, we, as well as the trial court, must defer to the administrative tribunal's findings of fact. Neither a circuit court nor an appellate court may substitute its judgment for that of the administrative board." *Percy Kent Bag Co. v. Missouri Commission on Human Rights,* 632 S.W.2d 480, 487 (Mo. banc 1982) (citation omitted).

■ Based on our review of the record, we conclude that MCHR's findings were supported by substantial evidence. It is undisputed that the frequency with which attendance records were reviewed was not established. The circuit court found this especially significant, because it appears to be inconsistent with MCHR's later findings as to the relative frequency of review of the employees' attendance records. We find that plaintiff presented evidence from which to infer that Quinn's attendance records were reviewed, or discipline was imposed, more frequently than for the three white employees.

David Curran, Busch's supervisor of plant employee relations, testified that a disciplinary violation notice would be sent out a few days after a review of an employee's records. Thus, because Quinn was disciplined six times, her records must have been reviewed six times, at or near the dates of disciplinary action. This is, essentially, MCHR's Finding of Fact 14. By reviewing the attendance records of the three white employees, which were before the Commission, and are a part of the record here, it is clear that, if Busch had reviewed those records as frequently as it reviewed Quinn's, those employees would have been disciplined more frequently than they actually were. This is, essentially, MCHR's Finding of Fact 17. Because the white employees were not so disciplined, there can be only two conclusions; either Busch did not review the white employees' records as often as Quinn's, or Busch did not impose discipline when a review of the records disclosed violations of the company's policy. This is, essentially, MCHR's Finding of Fact 16. The finding is a reasonable inference raised by the evidence, not merely an assumption. Having established that Quinn was treated differently from the white employees, plaintiff produced evidence from which it could be inferred that her race was a factor in the action taken against her. Thus, there was a prima facie case of racial discrimination. *See Barnes Hospital v. Missouri Commission on Human Rights,* 661 S.W.2d 534, 538 (Mo. banc 1983).

■ Busch articulated legitimate non-discriminatory reasons for the less frequent review and discipline of two of the three white employees. The hearing examiner and MCHR found these reasons to be supported by the evidence and accepted them as true. There was, however, no reason given for the preferential treatment afforded the third white employee. Busch had the burden of producing some evidence to show a legitimate non-discriminatory reason. *Id.* at 538. Its failure to do so, leaves the inference of racial discrimination unrebutted. The circuit court therefore erred in finding that the order was not supported by substantial evidence.

■ We turn now to Busch's contention that the doctrine of collateral estoppel bars a reversal of the circuit court's judgment. Collateral estoppel operates to prevent relitigation of issues already deter-

mined in a suit between the same parties. *Oates v. Safeco Insurance Co. of America,* 583 S.W.2d 713, 719 (Mo. banc 1979). We do not apply it here, however, because the record is barren of any indication that the issue involved here was ever decided before. We are confined to reviewing the record that is presented to us. *Williams v. Clean Coverall Supply Co. Inc.,* 613 S.W.2d 659, 664 (Mo.App.1980). Busch's assertions in its brief, unsupported by any reference to the record, *see* Rule 84.04(h), do not present the question to us for review. *Coulter v. Michelin Tire Corp.,* 622 S.W.2d 421, 437 (Mo.App.1981). We therefore reject Busch's point.

MCHR, on its second point, contends the trial court erred in assessing costs against it for the reason that absent a statutory provision allowing an assessment of costs against a state agency, no such assessment can be made. We agree. Generally, absent a statutory provision, court costs cannot be assessed against the State of Missouri, or its agencies or departments. Further, we find no statute authorizing an assessment of costs in this situation. The trial court erred in assessing costs against MCHR. Its second point is well taken.

The judgment of the trial court as to MCHR's orders 1 and 2 and the assessment of costs is reversed. Its judgment as to MCHR's orders 3 and 4 is affirmed.

CRIST, P.J., and PUDLOWSKI, J., concur.